UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

FILED
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.

★  AUG 1 7 2017  ★

BROOKLYN OFFICE

------------------------------------------------------x

OLBAN GONZALEZ,

               Petitioner,

      -against-

WILLIAM LEE, Superintendent,

               Respondent.

------------------------------------------------------x

**MEMORANDUM & ORDER**

14 CV 2514 (RJD)

DEARIE, District Judge.

Petitioner Olban Gonzalez, serving 79 years to life for second-degree murder, multiple counts of attempted murder and related charges,[1] seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254.

The charges arise out of a tragic episode of gang violence in the heart of suburbia. On February 17, 2008, a Nassau County nightclub hosted a party for several hundred local youths, many affiliated with either Salvadorans with Pride ("SWP") or 18th Street, two area gangs. Witnesses to a brief disturbance in the club telephoned friends to report that members of a third

---

[1] A jury found petitioner guilty on all counts, as follows: murder in the second degree, attempted murder in the second degree (3 counts), assault in the first degree (3 counts), and criminal possession of a weapon in the second degree (4 counts). The trial court imposed sentence as follows: 25 years to life for the second-degree murder and a determinate term of 25 years on each of the three attempted murders, consecutive to each other but concurrent to all other terms; a determinate term of 25 years on each of the three assaults, consecutive to each other and the murder sentence but concurrent with all others; and a determinate term of 15 years on each of the four criminal possession counts, consecutive to each other but concurrent with all others. The Appellate Division reduced the assault and attempted murder sentences from 25 to 18 years.

gang, MS-13, were believed to be involved. The recipients of these calls, SWP and 18th Street members with grievances against MS-13, soon converged outside the club, followed four youths believed, mistakenly, to be MS-13 into the parking lot, and fired a barrage of bullets into their car just as the ignition turned. Seventeen-year old Edwin Mejia Alvarado was killed, and Jose Lopez, Carlos Guevera and Saul Guevera were seriously wounded.

Petitioner, a member of 18th Street with a strong grievance against MS-13, whom he held responsible for killing his cousin earlier that day, admits he was among the assembly outside the club on the night of the shooting, and trial witnesses established that he arrived there armed and spoke openly of his intention to commit the crime. Witnesses also established that, accompanied by the other shooter but no one else, petitioner followed the victims into the parking lot[2] and admitted to the shooting moments later in the getaway vehicle. He repeated his admission, boastfully, on several subsequent occasions.

Nevertheless, emphasizing the lack of an eyewitness to the actual gunfire, petitioner insists, as he did at trial,[3] sentencing and on appeal, that he is innocent, presented here as a habeas claim that the evidence was legally insufficient. As additional grounds for habeas relief, he asserts that: (i) the trial court erred in denying his request for a missing witness instruction, (ii) certain counts are duplicative, (iii) his sentence is unconstitutionally cruel and unusual, (iv) his attorney rendered ineffective assistance, and (v) the prosecution engaged in misconduct.

As discussed below, petitioner has not shown a basis for disturbing the state court's

---

[2] There were two shooters; one was convicted in an earlier trial, and petitioner was tried on the single theory that he was the second shooter.

[3] Petitioner testified at his first trial, which ended in a mistrial after the jury was unable to reach a verdict. The jury at his second trial convicted on all counts.

substantive or procedural rulings on any of these claims or otherwise satisfied the standards for the extraordinary grant of habeas relief. His application is therefore denied and the petition is dismissed.

## FACTUAL BACKGROUND

### I. Trial Evidence

On the evening of February 11, 2008, several hundred mostly Salvadoran and Honduran teenagers, many affiliated with either 18th Street or SWP—gangs that generally got along with each other but not with MS-13—attended a youth party at the nightclub attached to the former Don Juan restaurant, located at the edge of the bustling retail corridor on Old Country Road in Westbury. During the event, SWP member Edgar Hernandez and others became involved in a confrontation with two other youths believed to affiliated with MS-13. Several at the party promptly telephoned SWP and 18th Street friends to report the incident and the apparent presence of the interlopers.

One recipient was SWP member (and cousin to Edgar Hernandez) Dwayne "Chocolate" Dailey, who in turn telephoned Jose Martinez to say that he "had problems with MS-13 guys" and wanted to go to Don Juan's to rescue his cousin. T. 835. Martinez telephoned his friend David Chicas, who agreed to drive.[4] Gerson Turcios, also known as Pepe, was also telephoned

---

[4] Dwayne Dailey, Jose Martinez and David Chicas were all codefendants. Martinez and Chicas cooperated and testified.

Martinez was charged with second degree criminal facilitation and two counts of second degree weapons possession; pled to attempted weapon possession; was adjudicated a youthful offender; and was sentenced to 1 1/3 to four years. Chicas was charged with one count each of criminal facilitation in the second degree and hindering prosecution in the first degree; pled to the latter count; and was sentenced to four months in prison. Dailey—the other shooter—faced the same charges as petitioner and was convicted, after trial, on all counts, and sentenced to an aggregate term of 25 years to life. The same accomplices testified at his trial, and the Appellate

3

from the party. The caller saw "some MS-13 people" inside the club, including "the kid that [had] reported" Turcios's friend Noe Perdomo to the authorities and "got him locked up." T. 979. Turcios then telephoned Perdomo to invite him to "catch a free one with him," which meant, "catch a fight." Perdomo drive them to Don Juan's "to fight the kid." T. 979.[5]

Turcios also telephoned petitioner, who was then at a Chinese restaurant with 18th Street friends Eliesser "Smiley" Martinez and Roberto "Cobra" Arevalo, and reported that MS-13 members were inside the club at Don Juan's. Only 20 hours earlier, petitioner's cousin and 18th Street member Javier Cuevas had been stabbed and petitioner blamed MS-13. Petitioner was at the crime scene moments after the incident; there, and later at the hospital, where Cuevas died, petitioner told Nassau County Detective Robert DiPietro that he was sure MS-13 was responsible and would "have to pay for this," and that "he [petitioner] is the only one out there working, that his boys haven't been doing shit." T. 805-808, 809.

Although the chronology is not seamless, Chicas and his group (including Dailey, Jose Martinez and others) were apparently the first to reach the vicinity of the club, parking in the lot of The Source Mall, located just across Old Country Road from Don Juan's. Chicas believed the plan, initially, was only to assist Dailey in extracting Hernandez.

Petitioner and his entourage (including Smiley and Cobra) were probably the next to arrive, also parking in The Source Mall lot. Chicas, from inside his vehicle, saw petitioner exit

---

Division rejected Dailey's claim that their testimony was not adequately corroborated. People v. Dailey, 86 A.D.3d 579 (2d Dep't) (also rejecting challenges to the sufficiency and the weight of the evidence), lv. app. denied, 17 N.Y.3d 902 (2011).

[5] Turcios and Perdomo were both charged with second-degree murder, three counts each of second-degree attempted murder and first-degree assault; each pled guilty to manslaughter, cooperated, and was sentenced to five years in prison.

his car; he then saw the handle and cylinder of a gun at petitioner's waist, and heard petitioner say "out loud in general" rather than to anyone specific, "[t]hat MS is going to pay tonight." T. 652, 651. Jose Martinez also heard petitioner "talking about the MS people inside the club" and saw petitioner lift his shirt to expose a gun in his waistband. T. 843. He also heard petitioner say, "Let's go get 'em," T. 843. Turcios, similarly, "heard people saying that there w[ere] MS people inside of Don Juan['s] that was gonna [sic] get it." T. 984. Both petitioner and Dailey talked about MS being in the club, but Turcios was not sure who said that MS "was going to get it." T. 985.

Dailey, Chicas and Martinez arrived unarmed, and none liked or trusted petitioner. After petitioner exposed his gun, Dailey directed Martinez to go to his (Jose's) brother Droopy, who was working down the street at California Pizza Kitchen, to retrieve Dailey's gun. When Martinez "came back," he "gave [the gun] to Dwayne Dailey. And [petitioner] was going like to kill MS." T. 836. Martinez heard petitioner "hyp[ing] Dailey to shoot the MS." T. 847. Martinez "told [Dailey] not to do it, but it was too late. I already gave him the gun." T. 836.

Smiley, in petitioner's car, saw Dailey approach and display a gun to petitioner; petitioner then walked off with Dailey to have a conversation. Smiley saw that at some point petitioner removed a pistol from his belt and showed it to Dailey. T. 1195-96.[6]

Soon, vehicles began leaving The Source Mall lot. Chicas moved his car across Old Country Road to the side street (Ellison Avenue) adjacent to Don Juan's; he parked in the direction of the rear of the club and its parking lot. Petitioner soon parked in front of Chicas.

---

[6] Smiley was not charged in connection with the Don Juan shooting. The record indicates that he was testifying under a cooperation agreement relating to his arrest for a different shooting. T. 1206-1207.

Chicas then got out and walked toward the front door of Don Juan's; petitioner, with Smiley and Cobra, followed suit, walking in the same direction but across the street, soon to be joined by Dailey. As instructed by petitioner and Dailey, Smiley and Cobra walked ahead, but upon reaching the corner, noticed that petitioner and Dailey were no longer behind them. They decided to "turn back" and then "heard shots." T. 1198-1199.[7]

Turcios and Perdomo, after leaving The Source Mall lot, stood on Old Country Road a block away from Ellison Avenue, as lookouts for possible MS-13 members exiting the club. Noticing a group with someone wearing MS-13's color, they signaled to petitioner and Dailey, who then followed the targets into the lot behind the club.

Turcios and Perdomo trailed behind petitioner and Dailey, but Turcios did not witness the shooting. He got "halfway," T. 987, and "only [saw] a figure with a hand raised, and then [he] heard the pop for [sic] a gun." T. 990. He thought there was "maybe one or two" shooters. T. 990. Perdomo, on the other hand, identified petitioner as a shooter at petitioner's first trial and another proceeding (T. 1783-84), but he did not testify at petitioner's second trial. After the shots were fired, Turcios and Perdomo ran back to their car and drove off. T. 991.

Jose Martinez gave a generally consistent account: he saw youths exit the club and head to the parking lot; he saw Turcios and Perdomo "r[u]n to" Dailey and petitioner, "communicating" something; and saw Dailey, petitioner, Turcios and Perdomo all proceed toward the rear parking lot. T. 850-851. Martinez did not see who went first; he heard the shots

---

[7] Chicas, who was in his car, saw Dailey "g[e]t out of a car" and "walk [ ] in the same direction [petitioner] was already heading to." T. 702. That "was the last visual [he] saw;" T. 703. Then "everything happened." The next thing he saw was "[petitioner's] car pulling off" just as he, too, was leaving after hearing the shots. T. 703.

but did not see who fired; and afterward saw Perdomo and Turcios running toward him but did not see where Dailey or petitioner went. T. 851-852.

Chicas had begun to leave before the shots were fired, having turned his car around; while Chicas waited at a traffic light, Jose Martinez and Reyes walked toward his car, got in, and then shots were heard. Then someone in the car then yelled "back up," Chicas reversed a short distance, and Dailey ran toward the car and got in. Chicas then drove off. His friend Johnny Rivera, who was sitting in the middle of the back seat, discovering Dailey's weapon, shouted "What the f**k" and "just pull[ed] up the gun that he was sitting with, that he felt." T. 657. Through the rearview mirror Chicas saw Rivera holding up the weapon.

The youths followed into the club's parking lot were the four shooting victims (Edwin Mejia, Saul Guevara, Carlos Guevara, and Jose Lopez) and their friend Jose Marvin Guevara, who headed toward his own car. Mejia, as noted, died from the gunshot wounds; the three surviving victims testified but none could identify the shooters. Jose Marvin, likewise, could not offer significant details about the shooters. All he could see was "a shadow of a weapon and a person" but could not see a face. T. 1598.

In addition, four witnesses testified that petitioner admitted that he shot the youths in the lot behind Don Juan's. Smiley testified that, moments after the shooting, while in the getaway car, he heard petitioner say that he had "shot somebody." T. 1201. Petitioner also said, "[w]e hit them, we hit them," and "we gave it to them, we gave it to them." T. 1201. Edwin Flores, who had made one of the calls to Dailey from inside the club, testified that several days after the shootings he encountered petitioner at the 24-7 Stop and Shop deli in Hempstead: "[petitioner] told me, did I hear about the shooting at Don Juan's and I said, yeah, [Dailey] told me about it.

[Petitioner] told me that him and Dwayne [sic] went to the shooting and shot in the back parking lot." T. 545. Petitioner told Flores "not to say anything." T. 572.[8]

David Chicas testified that about a week or two after the shooting he encountered petitioner at the 24-7 Stop and Shop deli. Petitioner "recognized [Chicas as] being there at Don Juan's th[at] night," and told Chicas "how . . . all the thing[s] happened because one of his friends was stabbed or sliced... and that was for revenge." T. 664, 665. Chicas continued:

> Q. And did [petitioner] tell you who he thought [had] stabbed . . . one of his friends?
> A. No...
> Q. ...what did he say was the revenge?
> A. That he was going to get an MS person that he saw.
> Q. And he told you that's why Don Juan's happened?
> A. Yes.
> Q. And did he tell you what he did at Don Juan's?
> A. He just told me he shot over this.
> Q. Did he tell you who he shot at?
> A. He shot at MS people.
> Q. Shot at people he thought were MS people?
> A. Yes. (T. 665).

Dailey's girlfriend Margaret Gomes also encountered petitioner at the 24-7 Stop and Shop deli about a week or two after the shooting. She overheard petitioner talking with someone she knew only as "Pow-Wow." Petitioner said that, along with Dailey, "he shot someone at the nightclub in Westbury." T. 1112. On a second occasion, petitioner "told [her] to [her] face that he killed the boy." T.1113.[9]

---

[8] Dailey, too, admitted his guilt to Flores: the day after the shooting, while Flores was at Edgar Hernandez's home, Dailey "just came and . . . said he shot inside of the car in the back parking lot." T. 543.

[9] Gomes did not remember exactly when her conversation with petitioner occurred. T. 1113. As for the location, on cross-examination, Gomes said that when petitioner "told [her] to

8

Petitioner's testimony from his first trial was also admitted. T. 1328-1425. His and Detective DiPietro's accounts of their conversations are consistent, with petitioner admitting that he told DiPietro that MS-13 has "got to pay" for killing Cuevas. T. 1344, 1404. Likewise, petitioner's and other witnesses' accounts of the sequence of events on the night of the shooting, leading up to the gathering at The Source Mall lot, are remarkably consistent. T. 1355 et seq.

Petitioner's account departs from the others', however, with his claim that, when some of the cars began leaving The Source Mall lot, he simply moved his to another part of the lot, parked, and listened to music. He said he had an invitation from girls in the club but did not want to go in because of what had happened to his cousin and the rumor that MS-13 members might be present. T. 1361-66. But he did not just go home "[b]ecause the night was young." T. 1367. Asked whether he knew if "anything was going to happen," petitioner testified: "Well, like I said, when [Turcios] called Smiley, Smiley told me that they had a problem with MS.... So then if there's a fight, maybe, you know, be [sic] a fight, I probably join." T. 1367. From where he was parked, he could see Dailey, Chicas, Turcios and Perdomo (and others) gathered in front of Don Juan's for "probably no more than a minute." T. 1369-70. Then "they started going different ways again." T. 1370. Then, while talking with Cobra and Smiley and waiting for the girls he knew to leave the club, he "heard the gunshots," and immediately drove off. T. 1371.

Additionally, petitioner maintained that he was unarmed, denied all of the inculpatory statements attributed to him, and did not recall any conversation in The Source Mall lot. On

---

[her] face that he did it," she was "eating Chinese food on Main Street" with her friend Roxanna. T. 1136. Redirect elicited the following sentence from her initial statement to police: "A guy I know as Softy whose real name is Olban was telling a guy I know as Pow-Wow that he got the MS n****rs at Don Juan's with Dwayne's gun." T. 1142. Gomes was in custody for 3 days for contempt before agreeing to testify before the grand jury.

cross examination, when asked, "Was there somebody there who decided it wasn't going to be a fight but it was going to be guns," petitioner replied, "Somebody. I don't know." T. 1411.[10]

Finally, the state introduced the weapon used by Dwayne Dailey, a .357 magnum revolver, which had been found in the home of a friend of Dailey's. Tests established that some of the bullets recovered from the scene of the shooting were fired from that gun. Other retrieved bullets, however, were .22 caliber, establishing that more than one gun was used in the shooting; no other weapon was recovered.

## II. Defense Motions

In a motion to dismiss at the close of trial, defense counsel argued that the evidence was insufficient because (i) the testimony of the accomplices was not adequately corroborated as required by New York law, (ii) the evidence of petitioner's admissions was neither credible nor corroborated as required by New York law, and (iii) "no person . . . identifies [petitioner] as the shooter." T. 1778. The trial court, viewing the evidence "in the light most favorable to" the prosecution, denied the motion. T. 1780.

The defense also requested a missing witness charge with respect to Perdomo, arguing that all the requirements were satisfied: Perdomo was incarcerated locally and thus under the prosecution's control; he would be expected to offer material testimony favorable to the prosecution; that testimony would not be cumulative, as no other witness identified petitioner as the shooter; and the prosecution failed to explain Perdomo's absence other than representing that he did not wish to testify. T. 1783-85. The court denied the request.

---

[10] The defense called William Martinez, one of the managers of Don Juan, who testified that at approximately 11:15 pm, a woman ran into the restaurant to tell him that there had been a shooting outside. She was very emotional, so he called 911 to deliver her account: she did not see the shooting but saw two black men and a black car. T. 1550 et seq.

## III.    Sentencing

At sentencing petitioner maintained his innocence.  He stated to the court: "You know, things happen every day, but I just want to say I know it wasn't right what happened to those guys, but I still didn't do it."  Transcript of Sentence, August 12, 2010, ECF Doc. 9 ("S.") at 7.

The sentencing court stated that the evidence was "overwhelming" and "really paints a picture of a cold-blooded, calculated execution and but for the grace of G-d there [aren't] four dead people as opposed to one dead person in this particular case."  S. 8.  The court also stated: "the sentence in this case should reflect the heinous and calculating nature of an execution, an[d] attempted execution of three innocent people who had nothing to do with [petitioner] whatsoever, were merely socializing and sat in the back of a car while [petitioner] and his codefendant walked calmly up to it and emptied their guns in the car."  S. 8.

## IV.    APPELLATE AND POSTCONVICTION PROCEEDINGS

## A. The Direct Appeal

### 1.  The Sufficiency Claim

On direct appeal, petitioner argued that the evidence was legally insufficient for the same three reasons raised by defense counsel at the close of trial.  The Appellate Division rejected both the general claim of insufficiency, People v. Gonzalez, 101 A.D.3d 1149, 1150 (2d Dep't 2012) ("Viewing the evidence in the light most favorable to the prosecution...we find that it was legally sufficient to establish the defendant's guilt beyond a reasonable doubt"), lv. app. denied, 21 NY.3d 1004 (2013), and the accomplice and admission corroboration claims.  Id.  The court also held that "upon [its] independent review . . . [it] was satisfied that the verdict of guilt was not against the weight of the evidence."  Id.

## 2. Other Appellate Claims

Agreeing with petitioner, the Appellate Division held that the trial court's failure to give a missing witness charge with respect to Perdomo was error; the court found: "In opposition to [petitioner's] prima facie showing that the uncalled witness could have reasonably been expected to testify favorably to the People, that he was knowledgeable about a material issue in the case, and that he was in the People's control, the People failed to account for the witness's absence or otherwise demonstrate that the charge would not be appropriate." Id. The court concluded, however, that "the error was harmless, as there was overwhelming evidence of [petitioner's] guilt, and no significant probability that the error contributed to his conviction." Id.

Finally, petitioner argued that his sentence, though "within the statutory limits," ECF Doc 9-6 at 67, was unduly harsh and constituted cruel and unusual punishment in violation of the Eighth Amendment, both because of its length and because the sentencing court did not consider his claimed mental health issues. Petitioner's appellate brief asserts that he suffered from "brain damage" from a 2005 car accident as well as attention deficit and bipolar disorders, and that, because of "disruptive," "confused," and "uncooperative" behavior exhibited during trial his fitness to proceed examination should have been conducted in a hospital.[11]

---

[11] Petitioner was apparently referred for a C.P.L. Article 730 psychiatric examination. Two state forensic psychologists concluded that petitioner was competent to proceed. Petitioner reports in his state appellate brief that these conclusions were based on two jointly conducted interviews, one at Riker's Island and the other at Nassau County Correctional facilities. Petitioner further reports that he terminated the first interview after ten minutes, and that he refused to cooperate during the second. See ECF 9-6 at 8. The defense psychologist, based on a third interview, concluded that because of petitioner's inability to focus and lack of cooperation he could not aid in his own defense. The court found petitioner was not incapacitated as defined in Article 730. Petitioner did not challenge that ruling on appeal. The testimony from petitioner's first trial that was read into the record at his second trial, and his remarks at sentence, exhibit a level of clarity that casts doubt upon his claim of mental instability.

The Appellate Division found the claim "unpreserved for appellate review" and "[i]n any event . . . without merit." Id. Nevertheless, the court held that the 25-year assault and attempted murder sentences "were excessive," id. at 1151, and reduced each to 18 years "as a matter of discretion in the interest of justice." Id. at 1150.

## B. Postconviction Proceedings in the Trial Court

In a motion for post-conviction relief pursuant to N.Y. Criminal Procedure Law § 440.10, petitioner claimed that (i) various counts of conviction were duplicative; (ii) there was no direct evidence that he possessed a gun and no eyewitness identifying him as a shooter; (iii) Dailey's gun was improperly introduced; (iv) his sentences should have run concurrently because his crimes were not separate and distinct; (v) the prosecutor committed misconduct during summation; and (vi) trial counsel was ineffective. The court, without reaching the merits, denied the motion in a one-paragraph order on the ground that the claims should have been raised on direct appeal. People v. Gonzales, Ind. No. 1738N/2008 (Sup. Court Nassau County Dec. 6, 2013) (Peck, J.). Leave to appeal was later denied.

## DISCUSSION

## I. GENERAL HABEAS STANDARDS

Habeas corpus is available only when a prisoner is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254. When the claims advanced have been first adjudicated by a state court, habeas review is deferential rather than de novo. See 28 U.S.C. § 2254 (d), as amended by the Antiterrorism and Death Penalty Act of 1996 ("AEDPA") ("An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim . . .

resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."); Burt v. Titlow, 134 S. Ct. 10, 16 (2013) (habeas courts "will not lightly conclude that a State's criminal justice system has experienced the extreme malfunction for which federal habeas relief is the remedy") (internal quotations, citations and alterations omitted); Renico v. Lett, 559 U.S. 766, 773 (2010) ( "AEDPA [ ] imposes a highly deferential standard for evaluating state-court rulings" and "demands that state-court decisions be given the benefit of the doubt") (internal quotations omitted); but see Brumfield v. Cain, 135 S. Ct. 2269, 2277 (2015) ("As we have also observed, however, even in the context of federal habeas, deference does not imply abandonment or abdication of judicial review, and does not by definition preclude relief")(internal quotation marks, citation and alterations omitted). The Supreme Court recently reaffirmed these standards. Virginia v. Le Blanc, 137 S. Ct. 1726, 1728 (2017) ("In order for a state court's decision to be an unreasonable application of this Court's case law, the ruling must be objectively unreasonable, not merely wrong; even clear error will not suffice") (internal quotation marks and citations omitted).:

Alternatively, "when a federal habeas petitioner challenges the factual basis for a prior state-court decision rejecting a claim, the federal court may overturn the state court's decision only if it was 'based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceedings.'" Burt, 134 S. Ct. at 16 (quoting 28 U.S.C. § 2254(d)(2)). A "state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." Wood v. Allen, 558 U.S. 290, 301 (2010). Further, 28 U.S.C. § 2254(e)(1) provides that "a determination of a

factual issue made by a State court shall be presumed to be correct," and that the petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."[12]

## II. ANALYSIS OF PETITIONER'S CLAIMS

### A. The Sufficiency Claim

The applicable federal sufficiency law is well-established:

> the critical inquiry . . . does not require a court to ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt. Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution.

Jackson v Virginia, 443 U.S. 307, 318-319 (1979) (internal quotations and citations omitted) (all emphases supplied by *Jackson* Court). See Cavazos v. Smith, 565 U.S. 1, 2 (2011) (reaffirming that Jackson v. Virginia controls in § 2254 context).

In short, under Jackson, "a federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Id. at 326. Where the state has first rejected the sufficiency claim on the merits, federal habeas deference is doubled. Cavazos, 565 U.S. at 2 (the "the deference to

---

[12] The Supreme Court and the Second Circuit have declined to address the relationship between § 2254(d)(2) and S 2254 (e)(1). Brumfield, 135 S. Ct. at 2282 ("We have not yet defined the precise relationship between § 2254(d)(2) and § 2254(e)(1)") (internal quotation and citation omitted); Garguilio v. Heath, 586 Fed. App'x 764, 766 n. 1 (2d Cir. Oct.10, 2014). The outcome here does not turn any arguable difference between the two provisions.

state court decisions required by § 2254(d)" is to be "applied to the [ ] already deferential review" of Jackson").

These standards foreclose any possibility of granting habeas relief on petitioner's sufficiency claim. The gravamen of petitioner's position is that the many witnesses who testified to his inculpatory acts and statements were not credible, but this Court's review *begins* with the uncategorical presumption that the jury *believed* these witnesses and drew all reasonable inferences in the prosecution's favor. The presumption essentially ends the discussion: to be sure, an overwhelming case is not unimpeachable, as petitioner's impassioned critiques suggest, but the evidence set forth above, if believed, overwhelmingly establishes petitioner's guilt. The state court's rejection of petitioner's sufficiency claim, therefore, was neither an unreasonable application of Supreme Court law nor factually unreasonable.

Petitioner's claim that the admission and accomplice testimony was uncorroborated is not reviewable here, for it arises solely under state law rather than the laws, treaties or Constitution of the United States, as is required for habeas jurisdiction. See generally 28 U.S.C. § 2254; Lewis v. Jeffers, 497 U.S. 764, 780 (1990) ("federal habeas corpus relief does not lie for errors of state law.").

In any event, these state law claims are meritless, as the Appellate Division correctly found. See Gonzalez, 101 A.D.3d at 1150. The evidentiary rule for accomplices provides that "[a] defendant may not be convicted of any offense upon the testimony of an accomplice unsupported by corroborative evidence tending to connect the defendant with the commission of the crime." N.Y. Penal Law § 60.22(1). "The 'corroborative evidence' required by this statute need not be powerful in itself. [It] need not show the commission of the crime; . . . it is enough if it tends to connect the defendant with the crime in such a way as may reasonably satisfy the jury

16

that the accomplice is telling the truth." People v. Rome, 15 N.Y.3d 188, 191-92 (2010) (internal quotations and citations omitted). See also People v. Breland, 83 N.Y.2d 286, 294 (1994) (the rule requires only a "slim corroborative linkage"). Here, petitioner's own testimony, along with the evidence offered by Detective DiPietro, among others, plainly satisfy this requirement. The rule for admissions provides that "[a] person may not be convicted of any offense solely upon evidence of a confession or admission made by him without additional proof that the offense charged has been committed." N.Y. Penal Law § 60.50. This statute requires only "some proof, of whatever weight, that a crime was committed by someone." People v. Chico, 90 N.Y.2d 585, 589 (1997) (internal citations omitted). There is no serious dispute that the crime to which petitioner confessed was in fact committed.

In any event, even if the state evidentiary rules were not satisfied, neither failure would be a basis for habeas relief. See United States v. Hamilton, 334 F.3d 170, 179 (2d Cir. 2003) (under federal law, accomplice testimony can be the sole basis of a conviction "so long as that testimony is not incredible on its face and is capable of establishing guilt beyond a reasonable doubt.") (internal quotations and citation omitted); Kirby v. Filion, 644 F.Supp.2d 299, 306 (W.D.N.Y. 2009) ("New York's confession corroboration rule . . . embodies no federal constitutional principle") (collecting cases).

The sufficiency arguments that petitioner raised only in his section 440 postconviction motion but not on direct appeal—*i.e.*, that there was no direct evidence that he possessed a weapon, that there was no eyewitness identifying him as a shooter, and that the murder weapon was improperly introduced at trial—are procedurally barred because, as noted, the state court denied them on the ground that they should have been raised on appeal. See Coleman v. Thompson, 501 U.S. 722, 729 (1991) (habeas claim is procedurally barred if it was decided "on a

17

state law ground that is independent of the federal question and adequate to support the judgment"); Murden v. Artuz, 497 F.3d 178, 192 (2d Cir. 2007) ("[a] state procedural bar is adequate if it is firmly established and regularly followed by the state") (internal quotations and citations omitted), cert. denied, 552 U.S. 1150 (2008); Dominique v. Artus, 25 F. Supp.3d 321, 333 (E.D.N.Y. 2014) ("the rule that a claim based upon a matter of record at trial cannot serve as the basis for relief under N.Y. CPL §440.10 is firmly established and regularly followed in New York") (collecting cases).

Such procedurally barred claims can be reviewed here only if petitioner demonstrates "cause for the default and actual prejudice as a result of the alleged violation of federal law, or . . . that the failure to consider the claims will result in a fundamental miscarriage of justice," Coleman, 501 U.S. at 750, and petitioner makes no such showing. In any event, these claims are meritless. Despite the lack of an eyewitness to the shooting, the evidence, for the reasons already discussed, overwhelmingly established petitioner's guilt; and petitioner's quarrel with the admission of the gun used by his coparticipant in the shooting is frivolous, reflecting his misapprehension of the basic principles of accomplice liability. See Penal Law § 20.00.

**B.      Petitioner's Remaining Claims**

**1.      The Failure to Give a Missing Witness Charge**

The trial court's failure to give a missing witness instruction based on the prosecution's decision not to call Perdomo does not give rise to a basis for habeas relief. "[L]ike the failure to give any other jury instruction, the failure to issue a missing witness instruction does not raise a constitutional issue and cannot serve as the basis for federal habeas relief unless the failure so infected the entire trial that the resulting conviction violated due process." Rodriguez v. Graham, 2017 WL 2838144, at *6 (E.D.N.Y., 2017) (Cogan, J.) (internal quotations, citations and

alteration omitted). Accord Kirby, 644 F, Supp.2d at 307 (rejecting missing witness instruction claim because habeas petitioner "can point to no clearly established Supreme Court precedent requiring a trial court to instruct the jury with respect to a missing witness.") (internal quotations, citations and alterations omitted) (collecting federal authorities).

Assuming without deciding that the right to a fair trial or other federal interest were implicated, habeas relief would be available only if the Appellate Division acted contrary to or misapplied Supreme Court law when it held that the trial court's failure to give the instruction was harmless error. Federal constitutional error is harmless unless that error "had a substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 622 (1993) (rejecting former harmless error standard of Chapman v. California, 386 U.S. 18, 24 (1967), which had required reversal of the conviction unless the state proved the error was harmless beyond a reasonable doubt) (internal quotation marks and citations omitted). Additionally, "in § 2254 proceedings a court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the 'substantial and injurious effect' standard set forth in Brecht . . . whether or not the state appellate court recognized the error and reviewed it for harmlessness under the harmless beyond a reasonable doubt standard set forth in Chapman." Fry v. Pliler, 551 U.S. 112, 121–22 (2007) (internal citations omitted). See also Jackson v. Conway, 763 F.3d 115, 140–41 (2d Cir. 2014) (Brecht standard applies in 2254 proceedings), cert. denied, 135 S. Ct. 1560 (2015).

The Court has already addressed the strength of the prosecution's case, and defense counsel in her summation marshalled the facts relating to Perdomo's absence and argued that they gave the jury "a reason to doubt." T. 1814-15. The Appellate Division's conclusion that the failure to give a missing witness instruction was harmless is, plainly, not a misapplication of

Brecht and Fry nor factually unreasonable.

## 2.     The Sentencing Claim

As noted, the Appellate Division held that petitioner's Eighth Amendment claim was

unpreserved, which means the claim is procedurally defaulted and unreviewable here because

petitioner has not shown cause for the default and prejudice, or that he is actually innocent. See

Coleman, 501 U.S. at 750. In any event, petitioner could not show that the appellate court's

alternative merits-based rejection of his Eighth Amendment claim is contrary to or a

misapplication of Supreme Court law. For sentences of a term of years "the only relevant clearly

established law amenable to the 'contrary to' or 'unreasonable application of' framework is the

gross disproportionality principle." Lockyer v. Andrade, 538 U.S. 63, 72 (2003). "[T]he precise

contours of [the principle] are unclear, [and] applicable only in the exceedingly rare and extreme

case." Id.[13] See also Thomas v. Larkin, 2013 WL 5963133, * 9 (E.D.N.Y. Nov. 7, 2013)

("successful Eighth Amendment challenges to the proportionality of a sentence have been

exceedingly rare") (internal quotation marks and citation omitted); Edwards v. Marshall, 589 F.

Supp. 2d 276, 290 (S.D.N.Y. 2008) ("a reviewing court rarely will be required to engage in

extended analysis to determine that a sentence is not constitutionally disproportionate because

the decision of a sentencing court is entitled to substantial deference") (internal quotation marks,

citations and alterations omitted). This is not that exceedingly rare case: the ruthlessness of the

multiple-victim shooting speaks for itself and the state appellate court has already interceded in

---

[13] To be sure, as the Supreme Court acknowledged, "[its] precedents in this area have not been a model of clarity," and "[i]ndeed, in determining whether a particular sentence for a term of years can violate the Eighth Amendment, [the Court has] not established a clear or consistent path for courts to follow." Lockyer, 538 U.S. at 72.

the name of justice.[14]

### 3. The "Multiplicity" Claims

Ground Four of the petition, asserting that petitioner was "subjected to Double Jeopardy due to [m]ultiplicity in the counts of a single transaction," advances in barebones fashion three distinct claims: first, that petitioner was "sentenced to separate penalties upon lesser included conclusory concurrent counts and lesser included offenses" (the "Lesser-Included Offense claim"); second, that "the people failed to demonstrate 'separate and distinct' acts [and that] they, in fact, characterize the incident singularly" (the "Separate and Distinct Acts" claim); and third, that petitioner "is subject to Double Jeopardy via receipt of multiple sentences for the alleged possession of a single weapon" (the "Multiple Weapon Counts" Claim).

As noted, petitioner raised each of these claims in his §440 motion and the trial court appropriately denied them as procedurally barred because petitioner could have but did not raise them on direct appeal. Accordingly, like other procedurally defaulted claims already discussed, these claims are unreviewable here because petitioner has not shown cause for the default and prejudice, or that he is actually innocent. See Coleman, 501 U.S. at 750. In any event, none of the three "multiplicity" claims would entitle petitioner to a grant of habeas relief.

a. The Lesser-Included Offense Claim

Petitioner asserts that, under New York law, criminal possession of a weapon, a Class C felony, is a lesser-included offense of first degree assault, a Class B felony, and that assault, in

---

[14] District court habeas jurisprudence is replete with the following pronouncement, from White v. Keane, 969 F.2d 1381, 1381 (2d Cir. 1992): "No federal constitutional issue is presented where, as here, the sentence is within the range prescribed by state law." Petitioner concedes that his sentence is within state statutory limits, but if that concession were dispositive, disproportionality would be a superfluous doctrine.

turn, is a lesser-included offense of attempted murder in the second degree, an A-1 felony. He further asserts that the lower grade counts should have been dismissed upon his conviction of attempted murder in accordance with C.P.L § 300.40(3)(b). That section provides, in pertinent part: "[a] verdict of guilty upon the greatest count submitted is deemed a dismissal of every lesser[-included] count submitted, but not an acquittal thereon."

Even if this claim were not procedurally barred, it would be unreviewable for the separate reason that it arises solely under state law. See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) ("it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions"); Crews v. Herbert, 586 F.Supp.2d 108, 118 (W.D.N.Y. 2008) (habeas petitioner's claim that first-degree assault conviction should be dismissed under C.P.L. section 300.40(3)(b) as a lesser-included offense of attempted murder does not present federal issue cognizable on habeas) (collecting authorities).

In any event, the claim is meritless. Under New York law, an offense is a "lesser included offense" of a higher-grade offense when:

> in all circumstances, not only in those presented in the particular case, it is impossible to commit the greater crime without concomitantly, by the same conduct, committing the lesser offense. That established, the defendant must then show that there is a reasonable view of the evidence in the particular case that would support a finding that he committed the lesser offense but not the greater.

People v Glover, 57 N.Y.2d 61, 63 (1982). See also People v Green, 56 N.Y.2d 427, 430 (1982) (issued in same term, articulating the Glover test in alternate language), reh'g denied, 57 N.Y.2d 775 (1982); C.P.L. § 1.20[37] ("When it is impossible to commit a particular crime without concomitantly committing, by the same conduct, another offense of lesser grade or degree, the latter is, with respect to the former, a 'lesser included offense'").

Under New York Penal Law § 125.25[1], a person is guilty of murder in the second

degree when, "with intent to cause the death of another person, he causes the death of such person or of a third person;" Penal Law § 110.0 provides that one attempts to commit a crime "when, with intent to commit a crime, he engages in conduct which tends to effect the commission of such crime." Under Penal Law § 120.10, a person is guilty of assault in the first degree when, "with intent to cause severe physical injury to another person he causes such injury to such person or to a third person by means of a deadly weapon or dangerous instrument." And, under Penal Law § 265.03, a person is guilty of criminal possession of a weapon in the second degree when, relevant here, either "(1) with intent to user the same unlawfully against another such person. . . . he possesses a loaded firearm" or "(3) such person possesses any loaded firearm [not in ] such person's home or business."

Plainly, it is theoretically possible to intend to cause the death of another person and attempt to do so without necessarily causing the "severe physical injury" required for assault or possession of loaded firearm; it is likewise possible to intentionally cause severe injury without using a gun. The first prong of the <u>Glover</u> test, therefore, is not satisfied, so no "lesser-included" offense relation exists among the three crimes; New York and habeas courts facing the exact triad of charges have reached the same conclusion. <u>See</u>, <u>e.g.</u>, <u>People v. Davis</u>, 95 A.D.2d 837, 838 (2d Dep't 1983) (assault in the first degree and criminal possession of a weapon "are not lesser included offenses" of attempted murder in the second degree "[b]ecause it is possible to attempt murder in the second degree without possessing a gun and without physically injuring someone") (internal citations omitted); <u>People v. Williams</u>, 123 A.D.3d 527, 528 (1st Dep't 2014) (rejecting claim that "first-degree assault count should have been dismissed as an inclusory concurrent count following the attempted murder [in the second degree] conviction"); <u>Crews v. Herbert</u>, 586 F.Supp.2d at 118–19 (habeas petitioner "not entitled under C.P.L. §

23

300.40(3)(b) to have his first degree assault conviction dismissed as an inclusory concurrent count of attempted murder").

To the extent petitioner's C.P.L. § 300.40(3)(b) claim implicates the Double Jeopardy Clause of the Fifth Amendment, which "protects persons from being punished twice for a single criminal offense," Aparcio v. Artuz, 269 F. 3d 78, 96 (2d Cir. 2001) (citing Brown v. Ohio, 432 U.S. 161, 165 (1977)), the claim is likewise without merit. "When a defendant has violated two separate criminal statutes, the protection against double jeopardy is implicated when both statutes prohibit the same offense or when one offense is a lesser included offense of the other." Aparicio, 269 F.3d at 96 (citing Rutledge v. United States, 517 U.S. 292, 297 (1996).

As the Second Circuit has explained:

> The fact that both offenses arise out of a single criminal transaction is not dispositive. The critical question is whether the 'offense'—in the legal sense, as defined by [the legislature]—... is the same as that charged in another. For almost seventy years, we have applied the test set out in Blockburger . . . to determine whether two statutes proscribe the "same" offense: "[W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." ... We also employ the Blockburger analysis to determine when one offense is a lesser included offense of another. To be the "same" offense under Blockburger, "the relationship of the two offenses must be like that of concentric circles rather than overlapping circles. If the two statutes each require proof of a fact that the other does not, then there are two offenses, and it is presumed that the legislature intended to authorize prosecution and punishment under both.

Aparicio, 269 F.3d at 97 (quoting Blockburger, 284 U.S. 299, 304 (1932); all other quotations and citations omitted).

Here, Blockburger analysis parallels theoretical impossibility analysis under Glover: attempted second-degree murder requires an intent to cause death, an element not required by first degree assault or weapons possession; first-degree assault requires severe physical injury, an

24

element not required by either of the other two crimes; and weapons possession requires having a loaded firearm, an element not required for assault or attempted murder. See P.L. §§ 125.25[1], 110.0 (attempted murder in the second degree); 120.10 (assault in the first degree); 265.03 (criminal possession of a weapon in the second degree); T. at 1942-59 (trial court so instructs the jury). Thus, each of the three statutory provisions requires proof of an additional fact not required by either of the other two; three distinct crimes having been committed, it is presumed that the legislature intended to authorize separate prosecution and punishment for each. Aparicio, 269 F.3d at 97. Petitioner's separate sentences for attempted murder, assault, and weapons possession, therefore, do not run afoul of the Double Jeopardy Clause.

      b. The "Separate and Distinct" Acts Claim

      Petitioner claims that his criminal acts were not sufficiently "separate and distinct" within the meaning of Penal Law §70.25 [2] to justify the consecutive sentences imposed. Even if the claim were not procedurally barred, it would be unreviewable because it arises solely under state law. Estelle, 502 U.S. at 67-68. In any event, the claim is meritless. Penal Law § 70.25 provides, in material part, that, "[w]hen more than one sentence of imprisonment is imposed on a person for two or more offenses committed through a single act or omission," the sentences must run concurrently. The prosecution "may . . . establish the legality of consecutive sentencing by showing that the 'acts or omissions' committed by [a] defendant were separate and distinct acts." People v. Laureano, 87 N.Y.2d 640, 643 (1996). Petitioner argues that a "fusillade" of bullets is akin to a single act or omission, and that the prosecution did not show that there was "a unique [guilty act] for each of the assaults and the murder" or "that the decedent and complainants were hit by different bullets." ECF 9-13.

      Petitioner's arguments do not establish a violation of Penal Law § 70.25, much less a

25

basis for habeas relief. With each victim occupying a different seat in the car and suffering bullet wounds to different body parts, it would defy the laws of physics for the same bullet to have caused the death of Jose Lopez and the multitude of injuries to the other three victims. A defendant's actions against multiple victims under these circumstances plainly constitute separate and distinct acts under P.L. §70.25[2]. See, e.g., People v. Li, 104 A.D.3d 704, 705 (2d Dep't 2013) (consecutive sentences for three counts of attempted murder upheld where "[e]ach was a separate and distinct act committed against a separate victim"), lv. app. denied, 21 N.Y.3d 1005 (2013); People v. Brathwaite, 63 N.Y.2d 839, 842-43 (1984) (where nine bullets fired by three shooters acting in concert during grocery store robbery caused the death of owner and clerk, consecutive life sentences for the two murders upheld; "although the two deaths may be said to have occurred in the course of a single extended transaction—the robbery—it was separate "acts" which caused the deaths of the owner and the clerk (i.e., there is no contention that it was the firing of the same shot that killed both the owner and the clerk)").

c. Multiple Sentences for Possession of a single gun

Finally, petitioner's multiplicity challenge to the four gun counts, were it not procedurally barred, would also fail on the merits. Possession of a loaded firearm in a place other than one's home or business (Penal Law § 265.03(3)) and possession of a firearm with intent to use it unlawfully against another person (Penal Law § 265.03(1)) are distinct crimes. See, e.g., People v. Hawkins, 973 N.Y.S.2d 437, 438 (3d Dep't) (upholds separate convictions under § 265.03(1) and § 265.03(3) based on same gun), lv. denied, 22 N.Y.3d 1041 (2013); Williams v. Jacobson, 2016 WL 4154700, *19 (Report & Recommendation) (S.D.N.Y. Aug. 5, 2016) (in the context of federal habeas, evaluating separately the evidence supporting convictions under P.L. §§ 265.03(1) and 265.03(3)), adopted, 2016 WL 7176648 (Dec. 7, 2016). Here, although the court

26

file does not include the indictment, it is evident from the jury instructions and the prosecution's theory of the case that petitioner was properly convicted of committing each of these crimes. See N.Y. Penal Law § 20.00.

### 5. Alleged Ineffectiveness of Counsel

Petitioner's allegations that counsel was ineffective are sparsely and vaguely pled; at most, he complains that counsel was not prepared, did not employ a meaningful trial strategy, failed to preserve certain objections, failed to request a circumstantial evidence charge, and did not investigate his mental health history. Procedural concerns aside,[15] these allegations are plainly not a basis for habeas relief.

To establish that counsel was ineffective petitioner would have to show that counsel's performance fell below "an objective standard of reasonableness" and that, "but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland v. Washington, 466 U.S. 668, 686 (1984). "Judicial scrutiny of counsel's performance must be highly deferential," and it is "[petitioner who] must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." Strickland, 466 U.S. at 689 (internal quotation and citation omitted). Further,

> there is no reason for a court deciding an ineffective assistance claim . . . even to address both components of the inquiry if the defendant makes an insufficient showing on one. In particular, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we

---

[15] As noted, petitioner made an ineffective assistance of counsel claim in his Section 440 motion in state court, where it was denied, without comment on the merits, on procedural grounds and so is barred here because petitioner does not show cause and prejudice or actual innocence. The prosecution argues, however, that because petitioner failed to include in his state court motion the few particulars raised here, the claim is unexhausted.

expect will often be so, that course should be followed.

Strickland, 466 U.S. at 697.

Here, without reaching the question of whether counsel was deficient in the ways alleged, the Court finds that petitioner cannot establish prejudice. Given the strength and comprehensiveness of the case against petitioner already discussed, petitioner could not show that, but for the features of counsel's performance he vaguely challenges, there is a reasonable probability he would have been acquitted.[16]

## CONCLUSION

For the reasons discussed, the application of petitioner Olban Gonzalez for relief under 28 U.S.C. § 2254 is denied in its entirety. Further, because Gonzalez has not "made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), a certificate of appealability will not issue.

SO ORDERED.

Dated: Brooklyn, New York
August 16, 2017

s/ RJD

RAYMOND J. DEARIE
United States District Judge

---

[16] Petitioner's final two claims can be disposed of with little discussion. The claim labeled "prosecutorial misconduct" consists, principally, of the evidentiary complaints already discussed. As a final "ground" petitioner asserts that the trial court "failed to adhere to statutory mandates." He states only that, "the statutes raised in [his 440 motion] show that the [trial court] deviated from the Legislative mandates upon rendition of verdict by petit jury, the sentence, [sic] which, like all the grounds related herein, cannot be discounted as harmless error." Pet'n at 11. The statutory provisions in those state court papers, however, appear to relate only to the multiplicity claims, already addressed.

28